## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DAELYN KITTLE,                  *

   **Plaintiff,**              *

   **v.**                   *      **CIVIL NO. JKB-25-2040**

**VKL GROUP, LLC,** *et al.,*       *

   **Defendants.**         *

                     *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM AND ORDER

Plaintiff Daelyn Kittle brings suit against VKL Group, LLC, t/a Hereford Collision Center ("VKL"), Nationwide Lien & Recovery, Inc. ("NLR"), and US Fleet Services, LLC ("USF"). (ECF No. 13.) Defendants have filed Motions to Dismiss. (ECF Nos. 14, 20, 21.) For the reasons set forth below, the Motions will be granted.

### I.   *Factual Background[1]*

Plaintiff alleges that he owns a 2024 Honda Accord (the "Vehicle"), which he purchased for $31,620.42. (ECF No. 13 ¶ 10.) Plaintiff brought the Vehicle to VKL for repairs in October 2024. (*Id.* ¶ 11.) Plaintiff alleges that a VKL employee named Elliot "accepted the Vehicle for repairs and Plaintiff relied upon Elliot's acceptance of the Vehicle, that [VKL] would perform the necessary repairs to the Vehicle and would submit the repair estimates to National General Insurance." (*Id.*)

VKL provided loaner vehicles to Plaintiff through a separate company, USF, while the Vehicle was undergoing repairs. (*Id.* ¶ 14.) On October 28, 2024, "USF and Plaintiff executed a

---

[1] Defendants have attached various exhibits to their Motions to Dismiss. The Court does not consider them in ruling on the pending Motions.

rental agreement for the loaner vehicle, specifically a silver [Subaru] even though the rental agreement described the loaner vehicle as [a] 2020 white Toyota Corolla." (*Id.* ¶ 15.) On November 1, 2024, "the transmission of the Subaru suddenly blew up while Plaintiff was driving." (*Id.* ¶ 16.) On November 2, 2024, VKL delivered a second loaner vehicle, this time the white Toyota Corolla described in the rental agreement. (*Id.* ¶ 18.) Plaintiff alleges that he communicated about these loaners with "Elliot," who worked for both VKL and USF. (*Id.* ¶¶ 16–17.)

On November 15, 2024, National General Insurance paid VKL $9,569 for repairs to the Vehicle. (*Id.* ¶ 19.) In January 2025, "Dev" at VKL and "Dave Wasserman" at National General Insurance exchanged emails regarding payment for repairs to the Vehicle. (*Id.* ¶¶ 20–23 (for example Wasserman stating that "[n]ow that I have all the invoices, I just want to make sure we are good before I lock and send payment").) The emails reflect disagreements between VKL and National General Insurance regarding the pricing for certain repairs. (*Id.* ¶¶ 20–23 (Wasserman stating "I am not going thru this supplement again. If you want to tell me which lines, the prices are wrong and I have an invoice I will change it, if not I'm done. You are the most unprofessional, poorly run excuse for a body shop that I have ever dealth [sic] with. If I don't hear back from you today, I am locking it where it is."); (Dev stating that "[y]ou need to go back and review the supplement you sent in your previous email. You've acknowledged receiving all the invoices, yet the supplement still lists incorrect prices for the distance sensor, fender, and hood. I've sent these invoices multiple times, each time pointing out exactly where the line items are and what the errors are, to save you time. Despite all this, the wrong prices remain on your end.").)

On February 3, 2025, "Elliot demanded that Plaintiff return the second loaner as a result of insurance coverage issues." (*Id.* ¶ 28.) And "[e]ven though UFS [sic] provided the second loaner to Plaintiff and is the owner of the second loaner and is required to have the loaner insured, Elliot

threatened Plaintiff by telling him that Plaintiff was the one required to have collision coverage for the loaner." (*Id.*) On February 4, 2025, "the radiator of the second loaner cracked and began smoking while Plaintiff was attempting to return it." (*Id.* ¶ 29.) USF billed Plaintiff $15,278.27 for these damages, and Plaintiff has disputed liability for those damages. (*Id.* ¶ 30.) On February 19, 2025, "Defendant [(Plaintiff does not specify which Defendant)] informed Plaintiff that [National General Insurance] had 'taken back all their money' and that if [National General Insurance] failed to make payments, Plaintiff would be responsible for the alleged cost of repairs." (*Id.* ¶ 31.)

About two months later, on April 8, 2025, Plaintiff requested via email that VKL provide certain information regarding the repairs, including an itemized bill of parts ordered, photographs of the vehicle, communications between VKL and National General Insurance, and an itemized bill for the rental vehicle. (*Id.* ¶ 24.) "Akhila" from VKL responded that "due to the ongoing investigation and the lien placed on the vehicle, we are unable to provide the requested documents directly at this time." (*Id.* ¶ 25.) Akhila directed Plaintiff to NLR for any inquiries. (*Id.*) Plaintiff called NLR and USF to obtain the documentation he requested, but they refused. (*Id.* ¶ 26.)

VKL refused to release the Vehicle to Plaintiff, and on April 9, 2025, Plaintiff received a notice of sale of the Vehicle. (*Id.* ¶ 35.) NLR was to auction the Vehicle and VKL asserted a mechanic's lien of $56,621.88. (*Id.* ¶ 36–37.) Plaintiff alleges that, "[o]n April 21, 2025, Plaintiff[] demanded that Defendants place a legal hold on all evidence, including preserving the Vehicle and not selling it. Defendants however refused to preserve evidence and abide by the legal hold and sold the Vehicle." (*Id.* ¶ 40.)

Also, in July 2025, National General Insurance "stated in a letter to the Better Business Bureau that '[d]ue to the body shop submitting unusually high supplements, the claims were referred to the Special Investigation Unit for further review.'" (*Id.* ¶ 27.)

3

Based on the foregoing, Plaintiff alleges that VKL, NLR, and USF are involved in an insurance fraud scheme. Plaintiff brings a civil conspiracy claim (Count I) based on the alleged scheme. (*Id.* ¶¶ 46–50.) Plaintiff summarizes the scheme as follows:

> All Defendants agreed that [VKL] would advertise and agree to peform [sic] automobile repair services and prepare fraudulent invoices by requesting unnecessary or false repairs which would inflate the cost of repairs to invoices submitted to insurance companies, which if not paid, would result in the imposition of a lien by NLR which would then force Plaintiff to pay for the repairs or lose the vehicle. USF then seizes the vehicles that were never repaired and uses them as loaners which explains the breakdown of the two loaners provided to Plaintiff; they are likely seized vehicles from prior victims of the fraudulent scheme. USF then blames the breakdown of the loaners on its victims, including Plaintiff, and demands money from its victims and Plaintiff.

(*Id.* ¶ 49.) Plaintiff also brings a fraud claim (Count II), alleging that Defendants made false representations in connection with the above scheme, including that VKL made false representations that it would repair the Vehicle and charge for actually necessary repairs, and USF made false representations when it represented that the loaner vehicles were in drivable condition. (*Id.* ¶¶ 51–60.)[2]

Plaintiff alleges that he "has been severely damaged by Defendants' actions, including, but not limited to, loss of value of Vehicle in the amount of $31,620.42, punitive damages of $90,000, loss of income, transportation, incurring alternate transportation costs, emotional distress, attorney's fees and court costs." (*Id.* ¶¶ 50, 60.)

## II.   *Legal Standard*

Motions to dismiss for lack of subject matter jurisdiction are governed by Federal Rule of Civil Procedure 12(b)(1). "Defendants, seeking dismissal of diversity actions for lack of a sufficient amount in controversy, must . . . shoulder a heavy burden. They must show the legal impossibility of recovery to be so certain as virtually to negative the plaintiff's good faith in

---

[2] Plaintiff initially asserted breach of contract and unfair or deceptive trade practices claims in his initial Complaint. (ECF No. 1.) However, he chose to omit those claims in his Amended Complaint. (*See generally* ECF No. 13.)

asserting the claim." *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 638 (4th Cir. 2010) (citations and internal quotation marks omitted). Further, "when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 446 U.S. at 662. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

When a plaintiff alleges fraud, he must meet the heightened pleading requirements of Rule 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." A plaintiff must "describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. These facts are often referred to as the who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379

5

(4th Cir. 2008) (citation and internal quotation marks omitted).

### III. Analysis

Defendants have each filed a Motion to Dismiss. (ECF Nos. 14, 20, 21.) Defendants argue that the Amended Complaint must be dismissed for lack of subject matter jurisdiction because Plaintiff has failed to allege that the amount in controversy meets the jurisdictional threshold of $75,000. Defendants also argue that the Amended Complaint must be dismissed because it does not state a plausible claim for relief. The motions will be granted because the Amended Complaint fails to state a claim.

#### A. Amount in Controversy

The Court turns first to the amount in controversy. As noted above, "[i]f the plaintiff claims a sum sufficient to satisfy the statutory requirement, a federal court may dismiss only if it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed." *JTH Tax*, 624 F.3d at 638 (citation and internal quotation marks omitted). Further, "[i]t is well established that punitive damages may be aggregated with other damages to satisfy the amount-in-controversy requirement." *Joy Fam. Ltd. P'ship v. United Fin. Banking Cos., Inc.*, Civ. No. ELH-12-3741, 2013 WL 4647321, at *9 (D. Md. Aug. 28, 2013) (internal quotation marks omitted) (collecting cases). However, "claims for punitive damages proffered for the purpose of achieving the jurisdictional amount should be carefully examined." *Saval v. BL Ltd.*, 710 F.2d 1027, 1033 (4th Cir. 1983).

Defendants argue that Plaintiff has failed to allege malice and that Plaintiff's request for $90,000 is "nothing more than a hypothetical trebling of Plaintiff's alleged damages of $31,620.42." (*See* ECF No. 14-1 at 14.) Further, Defendants argue that the Amended Complaint "lacks factual allegations that, taken as true, show actual malice." (*Id.*) However, this ignores Maryland law which provides that, in an action for fraud, "[t]he defendant's actual knowledge of

falsity, coupled with his intent to deceive the plaintiff by means of the false statement, constitutes the actual malice required to support an award of punitive damages." *Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1126 (Md. 1995). In other words, "the elements of the tort of fraud or deceit in Maryland, where the tort is committed by a defendant who knows that his representation is false include the type of deliberate wrongdoing and evil motive that has traditionally justified the award of punitive damages."[3] *Id.*

Plaintiff has alleged fraud, which—if proven—could ultimately support an award of punitive damages.[4] Thus, the Court examines whether Plaintiff has sufficiently alleged fraud.

### B. Failure to State a Claim

Turning first to the fraud claim against the three Defendants, in an action for fraud, as previously noted, a plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ P. 9(b). A plaintiff must "describe the . . . who, what, when, where, and how of the alleged fraud." *Kellogg Brown.*, 525 F.3d at 379 (citation and internal quotation marks omitted). And, under Maryland law:

> To prove an action for civil fraud based on affirmative misrepresentation, the plaintiff must show that (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

---

[3] The court in *Ellerin* contrasted this situation with fraud "based on the alternative form of the knowledge element, namely a 'reckless disregard' as to the truth of the representation." *Ellerin*, 652 A.2d at 1126. The court concluded that reckless disregard and reckless indifference concerning the truth of a representation "falls short of the mens rea which is required to support an award of punitive damages." *Id.* Here, however, Plaintiff does not allege that Defendants acted with reckless disregard but rather appears to proceed on a theory of intentional misrepresentation. (*See, e.g.*, ECF No. 13 ¶ 54.)

[4] Because the $90,000 in punitive damages exceeds the jurisdictional threshold, the Court does not address Defendants' other amount-in-controversy arguments.

*Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005). Further, the Fourth Circuit has described the "multiple purposes of Rule 9(b)" as "providing notice to a defendant of its alleged misconduct, of preventing frivolous suits, of eliminating fraud actions in which all the facts are learned after discovery, and of protecting defendants from harm to their goodwill and reputation[.]" *U.S. ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 456 (4th Cir. 2013) (citation, internal quotation marks, and alterations omitted). "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)

With respect to VKL, Plaintiff does not sufficiently allege fraud. He alleges that VKL falsely represented that it would repair his vehicle when it accepted his vehicle for repairs. Even if the Court assumes that merely accepting the Vehicle for repairs constitutes a representation to Plaintiff, Plaintiff does not sufficiently allege that any such representation "was made for the purpose of defrauding the plaintiff." *Hoffman*, 867 A.2d at 292. Plaintiff does not sufficiently allege that VKL did not repair his vehicle, or that VKL submitted fraudulent invoices to his insurance company. Plaintiff alleges that "[o]n July 11, 2025, [National General Insurance] stated in a letter to the Better Business Bureau that '[d]ue to the body shop submitting unusually high supplements, the claims were referred to the Special Investigation Unit for further review.'" (ECF No. 13 ¶ 27.) However, this allegation only suggests that the supplement costs were high, not that they were fraudulent. Plaintiff does not allege what claims were referred to the Special Investigation Unit, what the Special Investigation Unit is, or the outcome of any review. Plaintiff also alleges that, in emails to National General Insurance, a VKL employee named Dev made false statements in the form of inflated invoices related to the repair of his vehicle. However, the emails

8

Plaintiff quotes merely reflect a disagreement between the VKL and National General Insurance; they are not suggestive of fraud. (*See* ECF No. 13 ¶¶ 20–23 (Wasserman stating "I am not going thru this supplement again. If you want to tell me which lines, the prices are wrong and I have an invoice I will change it, if not I'm done. You are the most unprofessional, poorly run excuse for a body shop that I have ever dealth [sic] with. If I don't hear back from you today, I am locking it where it is."); (Dev stating that "[y]ou need to go back and review the supplement you sent in your previous email. You've acknowledged receiving all the invoices, yet the supplement still lists incorrect prices for the distance sensor, fender, and hood. I've sent these invoices multiple times, each time pointing out exactly where the line items are and what the errors are, to save you time. Despite all this, the wrong prices remain on your end.").)

To be sure, Plaintiff alleges that "[VKL] would advertise and agree to peform [sic] automobile repair services and prepare fraudulent invoices by requesting unnecessary or false repairs which would inflate the cost of repairs to invoices submitted to insurance companies" (*id.* ¶ 49) and that "[VKL] created fraudulent invoices that overestimated the amount of repairs so it could collect money to which it was never entitled" (*id.* ¶ 53), but these are conclusory statements that are devoid of the factual enhancement that would render them plausible, and they fail Rule 12(b)(6)'s plausibility standard and Rule 9(b)'s heightened pleading standard.

Plaintiff likewise does not sufficiently allege fraud with respect to USF. Plaintiff alleges that USF initially loaned him a Subaru instead of a Toyota, that the Subaru broke down a few days after he began using it, that USF then loaned him the initially-promised Toyota, and the Toyota broke down approximately three months later. From these facts, the Plaintiff asks the Court to make the speculative leap that USF misrepresented the state of these rental cars, knowing that they were not suitable to be driven. However, these facts do not sufficiently allege fraud, and certainly not by the heightened pleading standard. Plaintiff also alleges that although "UFS [sic] provided

9

the second loaner to Plaintiff and is the owner of the second loaner and is required to have the loaner insured, Elliot threatened Plaintiff by telling him that Plaintiff was the one required to have collision coverage for the loaner," and that "USF invoiced Plaintiff for the repairs to the second loaner, alleging he was liable to them in the amount of $15,278.27." (ECF No. 13 ¶¶ 28, 30.) This is likewise insufficient to state a claim of fraud against USF. Plaintiff conclusorily alleges that USF "is required to have the loaner insured" but he does not allege that USF ever told him as much (nor how he came to that understanding). He also does not allege that the over $15,000 in damages was somehow inaccurate or false. Accordingly, the fraud claim will be dismissed as to USF.

With respect to NLR, the Amended Complaint is devoid of any representations at all, let alone false ones. Plaintiff alleges only that NLR refused to provide him with certain information and that NLR auctioned off the Vehicle. Plaintiff also conclusory alleges that "NLR auctioned Plaintiff's vehicle and is a willing participant of the fraudulent scheme." (*Id.* ¶ 58.) These allegations are plainly insufficient to sustain an allegation of fraud against NLR. Further, Plaintiff does not plausibly allege any reliance on any statements made by NLR, as he does not allege that he did or did not do anything as a result of any actions or statements by NLR. Accordingly, the fraud claim will be dismissed against NLR.

Finally, Plaintiff does not plausibly allege a conspiracy between VKL, USF, and NLR. This claim must also be alleged in accordance with Rule 9(b). *Adobe Sys. Inc. v. Gardiner*, 300 F. Supp. 3d 718, 731 (D. Md. 2018) ("Similar to claims for fraud, conspiracy to commit fraud must abide by Rule 9(b)'s particularity requirement."). "Civil conspiracy is not an independent cause of action under Maryland law, and a defendant's liability for civil conspiracy depends entirely on its liability for a substantive tort." *Lilly v. Balt. Police Dep't*, 694 F. Supp. 3d 569, 592 (D. Md. 2023) (citation and internal quotation marks omitted). Based upon the foregoing discussion, Plaintiff fails to sufficiently allege a conspiracy.

10

## IV.    Conclusion

For the foregoing reasons, it is ORDERED that:

1.  Defendants' Motions to Dismiss (ECF Nos. 14, 20, and 21) are GRANTED; and

2.  Plaintiff's Amended Complaint is DISMISSED.

DATED this _11_ day of June, 2026.

BY THE COURT:

_James K. Bredar_

James K. Bredar
United States District Judge